The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
March 4, 2021

## 2021COA27

**No. 20CA0732, *Fisher v. ICAO* — Labor and Industry —
Workers' Compensation — Benefits — Physical Impairment
Ratings**

Subsections (3)(a)(I) and (3.7) of section 8-42-101, C.R.S.
2020, state that, in workers' compensation cases, physical
impairment ratings "shall be based on" the revised third edition of
the American Medical Association's Guides to the Evaluation of
Permanent Impairment. In this opinion, a division of the court of
appeals considers the question whether the phrase "shall be based
on" the revised third edition of the Guides means that a doctor is
barred from using an evaluative process to determine an
impairment rating that is not described in the Guides. The division
answers the question "no."

Court of Appeals No. 20CA0732
Industrial Claim Appeals Office of the State of Colorado
WC No. 5-068-151

Kerry Fisher,

Petitioner,

v.

Industrial Claim Appeals Office of the State of Colorado and State of Colorado
Department of Corrections,

Respondents.

ORDER AFFIRMED

Division I
Opinion by CHIEF JUDGE BERNARD
Rothenberg* and Taubman*, JJ., concur

Announced March 4, 2021

Hassler Law Firm, LLC, Stephen M. Johnston, Pueblo, Colorado, for Petitioner

No Appearance for Respondent Industrial Claim Appeals Office

Philip J. Weiser, Attorney General, D. Clay Thornton, Senior Assistant Attorney
General, Denver, Colorado, for Respondent State of Colorado Department of
Corrections

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2020.

¶ 1     The American Medical Association publishes *Guides to the Evaluation of Permanent Impairment* that have been used over the years by doctors in workers' compensation systems to evaluate and to describe patient impairments in terms of percentages of total disability.  Ellen Smith Pryor, *Compensation and a Consequential Model of Loss*, 64 Tul. L. Rev. 783, 798 n.42 (1990).  The Guides are focused on "specifying methods of measurement and the assignment of a single percentage for a given impairment."  *Id.* There are different editions of the Guides — the most recent edition is the sixth, *see* AMA, *AMA Guides to the Evaluation of Permanent Impairment, Sixth Edition: Hardcover*, https://perma.cc/6JZ6-6T7U — and there are "significant differences among" them, "not only in emphasis of certain areas, but also as a reflection of the latest consensus in medical science within its subject matter."  *Litchfield's Case*, 15 N.E.3d 252, 254 n.7 (Mass. App. Ct. 2014).

¶ 2     The revised third edition of the Guides is mentioned in section 8-42-101, C.R.S. 2020, of Colorado's workers' compensation statutes, specifically in subsections (3)(a)(I) and (3.7).  These subsections address one aspect of how a doctor should evaluate a work-related injury of a joint to determine the extent of the joint's

impairment, which, in turn, is used to determine the level of compensation that the worker will receive.

¶ 3    As is pertinent to our analysis, subsection 101(3)(a)(I) states that "impairment rating guidelines . . . shall be based on the revised third edition of the [Guides] in effect as of July 1, 1991, and medical treatment guidelines and utilization standards."  Subsection 101(3.7) is similar: "On or after July 1, 1991, all physical impairment ratings used under articles 40 to 47 of this title shall be based on the revised third edition of the [Guides], in effect as of July 1, 1991."

¶ 4    In this appeal, we must address a question of statutory interpretation: Does the phrase "shall be based on the revised third edition" of the Guides mean that a doctor is barred from using an evaluative process to determine an impairment rating that is not described in the Guides' revised third edition?  For reasons that we set out below, we answer this question "no."

¶ 5    This statutory interpretation question is raised by claimant, Kerry Fisher, who seeks review of a final order of a panel of the Industrial Claim Appeals Office.  The order upheld the decision of an administrative law judge, who assigned him a scheduled

impairment rating of thirteen percent for his injured left knee. We affirm.

## I. Background

¶ 6 The facts of this case are undisputed. Claimant worked as a correctional officer for the Colorado Department of Corrections. In December 2017, he suffered an injury to his left knee while walking up some stairs. The department admitted that claimant injured his knee while he was on duty.

¶ 7 Claimant's authorized treating physician decided that he was at maximum medical improvement as of early January 2019. The physician also decided that the injury to his knee was permanent. Using a method known as "normalization," which we will describe shortly, the physician calculated that the net impairment was thirteen percent of the lower leg. The department filed a final admission of liability based on the maximum medical improvement date and the impairment rating.

¶ 8 Claimant thought that his impairment rating should have been higher. He challenged the physician's methodology of "normalizing" the impairment to his left knee because it had not been based on the Guides' third edition.

¶ 9     When describing this methodology, the physician explained in a deposition that "normalization" is a process in which doctors compare the range of motion of a patient's uninjured joint — in this case, claimant's right knee — with the range of motion of the patient's injured joint — in this case, claimant's left knee. The range of motion in the uninjured joint is considered to be the baseline. Once the range of motion in both joints is determined, the doctor then subtracts any impairment to the range of motion of the uninjured joint from the impairment to the injured joint to reach the final impairment figure.

¶ 10    The practice of normalization is summarized in a Desk Aid published by the Department of Labor and Employment, Division of Workers' Compensation. Dep't of Lab. & Emp., Div. of Workers' Comp., Desk Aid #11, *Impairment Rating Tips* (July 2020), https://perma.cc/G9KX-Q2ZH. As is pertinent to our analysis, in addition to describing the normalization process, the Desk Aid's discussion of "Rating of Extremities Using Contralateral Joint/ 'Normalization'" makes several other points.

- Using the uninjured joint for comparison purposes may be "a better representation of the patient's pre-injury state

than . . . [the] population norms" described in the revised third edition of the Guides. *Id.*

- The revised third edition of the Guides "has little commentary on" normalization, while the fifth edition and the Division of Labor "consider it reasonable to compare both extremities [ — i.e., normalization — ] when there are specific conditions which would make the opposite, non-injured extremity serve as a better individual baseline." *Id.*

- An evaluating doctor should not use normalization if the opposite joint "has a known previous injury because that joint may not reflect the 'normal' [range of motion] for that individual." *Id.*

¶ 11 The revised third edition of the Guides — the edition mentioned in subsections 101(3)(a)(I) and 101(3.7) — does not address normalization. But, as we mentioned above, the fifth edition discusses it, and, according to the physician, the normalization process, as outlined in the Desk Aid, has been taught to doctors in workers' compensation accreditation courses for at least the last decade.

¶ 12     In claimant's case, normalization reduced his range of motion impairment by nine percentage points because he had pre-existing degenerative arthritis in his knees.

¶ 13     When considering this case, the administrative law judge noted that panels of the Industrial Claim Appeals Office had already rejected numerous challenges to normalization and to the Desk Aid, as had a division of this court in *Kurtz v. Industrial Claim Appeals Office,* (Colo. App. No. 11CA2561, Oct. 18, 2012)(not published pursuant to C.A.R. 35(f)).  The judge then rejected claimant's challenge to the validity of the Desk Aid, concluding that normalization was a legitimate process and that its use did not violate any mandate in subsections 101(3)(a)(I) and 101(3.7).  The judge therefore awarded claimant benefits based on the physician's determination that the claimant's left knee was thirteen percent impaired.  The reviewing panel affirmed the judge's order.

## II.  General Legal Principles

¶ 14     We uphold a judge's factual findings in a workers' compensation case if they are supported by substantial evidence in the record.  § 8-43-308, C.R.S. 2020; *Kieckhafer v. Indus. Claim Appeals Off.*, 2012 COA 124, ¶ 12.  "However, we review de novo

6

questions of law and of the application of law to undisputed facts." *Winter v. Indus. Claim Appeals Off.*, 2013 COA 126, ¶ 7. Consequently, if a panel's decision misconstrues or misapplies the law, it does not bind us. *Paint Connection Plus v. Indus. Claim Appeals Off.*, 240 P.3d 429, 431 (Colo. App. 2010). Because the underlying facts are undisputed in this case, we review the panel's application of the law to the facts de novo.

¶ 15     We also review the panel's interpretation of the statutes at issue in this case de novo. *Lobato v. Indus. Claim Appeals Off.*, 105 P.3d 220, 223 (Colo. 2005). When interpreting a statute, we must determine and give effect to the legislature's intent. *Davison v. Indus. Claim Appeals Off.*, 84 P.3d 1023, 1029 (Colo. 2004). If the statutory language is clear, we interpret the statute according to its plain and ordinary meaning. *Specialty Rests. Corp. v. Nelson*, 231 P.3d 393, 397 (Colo. 2010).

### III.  Analysis

¶ 16     Claimant contends, as he did at the previous stages of his case, that (1) subsections 101(3)(a)(I) and 101(3.7) state that impairment ratings "shall be based" on the revised third edition of the Guides; therefore (2) doctors cannot employ the process of

normalization because it is not mentioned in the revised third edition; (3) even though normalization is discussed in the Desk Aid, doctors nonetheless cannot use the process because the Desk Aid "is not law"; and, as a result, (4) the Division of Workers' Compensation "has overstepped its authority and changed the calculation of extremity ratings inconsistently with the law." We disagree for the following three reasons, and we therefore conclude that the panel did not err when it affirmed the judge's order.

¶ 17    First, the plain language of subsections 101(3)(a)(I) and 101(3.7) did not bar the physician from employing the process of normalization. To remind the reader, both subsections provide that impairment ratings "shall be *based* on" the revised third edition of the Guides. § 8-42-101 (emphasis added).

¶ 18    The use of the word "based" is critical to interpreting subsections 101(3)(a)(I) and 101(3.7). As a verb, it means "to find a foundation or basis for: to find a base for" and "to make, form, or serve as a base for." Merriam-Webster Dictionary, https://perma.cc/5SP2-LPZ5. Among the many definitions of the noun "base," the most relevant to this case are: "a main ingredient"; "a first or bottom layer of something on which other elements are

8

added"; "the fundamental part of something"; and "the starting point or line for an action or undertaking." *Id.*

¶ 19    So, when the legislature stated that impairment ratings shall be "based on" the revised third edition of the Guides, it meant that the revised third edition is the starting point, not the exclusive fount, of impairment rating methodology. By employing "based on," instead of using a more limiting word such as "only," the legislature made clear that doctors should have some leeway and discretion when determining a patient's final impairment rating. When viewed from this perspective, we can see that the legislature intended the revised third edition to be the foundation upon which a doctor can begin to develop an impairment rating.

¶ 20    The Kansas Supreme Court reached the same conclusion in *Johnson v. U.S. Food Service*, 478 P.3d 776, 779 (Kan. 2021). *Johnson* involved Kansas's version of subsections 101(3)(a)(I) and 101(3.7), which reads that "[t]he extent of permanent partial general disability shall be . . . based on [the Guides]." *Id.* (quoting 2013 Kan. Sess. Laws 539). The court reasoned that "[u]sing the phrase 'based on' typically signifies a guideline rather than a mandate." *Id.* at 780. In other words, "[t]he use of the phrase 'based on' indicates

9

the [l]egislature intended the [Guides] to serve as a standard starting point . . . ." *Id.*; *cf. Hughes v. United States*, 584 U.S. ___, ___, 138 S. Ct. 1765, 1775 (2018)(A court "imposes a sentence that is 'based on' a [federal Sentencing] Guidelines range [in a criminal case] if the range was a basis for the court's exercise of discretion in imposing a sentence.").

¶ 21    Second, in addition to referring to the revised third edition of the Guides, subsection 101(3)(a)(I) states that "impairment rating guidelines . . . shall [also] be based on . . . medical treatment guidelines and utilization standards." According to the physician, normalization has been taught to doctors for at least ten years — which suggests that normalization is a utilization standard — and it is discussed in the Desk Aid — which indicates that normalization is found in medical treatment guidelines. The Desk Aid therefore supplies guidance for doctors who are determining permanent impairment ratings.

¶ 22    But, claimant asserts, by promulgating the Desk Aid, the Division of Workers' Compensation adopted a "law[] that [was] contrary to" subsections 101(3)(a)(I) and 101(3.7). *See Suetrack USA v. Indus. Claim Appeals Off.*, 902 P.2d 854, 855 (Colo. App.

10

1995)("Any regulation that is contrary to or inconsistent with the regulatory authorizing statute is void.").

¶ 23     The Division might have set up such a conflict (1) if it had required doctors to follow the normalization process, as described in the Desk Aid; or (2) if it had issued a rule under the rule-making process of the Administrative Procedure Act, *see* § 24-4-103(1), C.R.S. 2020, that incorporated the contents of the Desk Aid, and this rule "establishe[d] a norm that commands a particular result in all applicable proceedings," *Hammond v. Pub. Emps.' Retirement Ass'n*, 219 P.3d 426, 428 (Colo. App. 2009).

¶ 24     But it did not set up such a conflict. Rather, using the same reasoning that supports our conclusion that the phrase "based on" does not restrict doctors to using the revised third edition of the Guides, we further conclude that the phrase "based on" does not require doctors to use "medical treatment guidelines and utilization standards" such as the Desk Aid instead of the revised third edition. *See* § 8-42-101(3)(a)(I).

¶ 25     The Desk Aid was not issued pursuant to the rule-making process, and there is no indication that the Division intended it to serve as a rule that would mandate a particular result in all cases.

11

Rather, the Desk Aid simply "establishes guidelines that do not bind the agency to a particular result." *Hammond*, 219 P.3d at 428. For example, when discussing normalization, the Desk Aid states that "the Division consider[s] it *reasonable* to compare both extremities when there are *specific conditions* which would make the opposite, non-injured extremity serve as a *better* individual baseline." (Emphasis added.) In this way, the Desk Aid serves as an "interpretive rule" as described by section 24-4-103(1), which is not subject to the formal rule-making process, including notice and an opportunity for comments, and which is "not meant to be binding . . . ." *See Hammond*, 219 P.3d at 428. Indeed, the panel concluded that the Desk Aid was an interpretive rule, and we agree.

¶ 26 Third, it has long been the law that the two inquiries into whether, in the course of conducting a division-sponsored independent medical examination, a doctor properly applied the Guides, and whether the subsequent rating was overcome by clear and convincing evidence, "are questions of fact." *Wackenhut Corp. v. Indus. Claim Appeals Off.*, 17 P.3d 202, 204 (Colo. App. 2000); *see also McLane W. Inc. v. Indus. Claim Appeals Off.*, 996 P.2d 263, 265 (Colo. App. 1999)("Whether the . . . physician has properly

12

applied the . . . Guides in ascertaining the impairment rating and whether that rating has been overcome by clear and convincing evidence are questions of fact to be determined by" the judge.). And, because the appropriate application of the Guides is a question of fact, a panel will not set aside a judge's decision if it is supported by substantial evidence in the record. *See Wackenhut*, 17 P.3d at 204; *see also Leewaye v. Indus. Claim Appeals Off.*, 178 P.3d 1254, 1256 (Colo. App. 2007)("We are bound by the [judge's] factual determinations . . . if they are supported by substantial evidence in the record.").

¶ 27     Yet, in the twenty years since *Wackenhut* and *McLane* were issued, the legislature has not amended subsection 101(3)(a)(I) or subsection 101(3.7) to change this law by limiting doctors' discretion or by requiring them to comply strictly with the revised third edition of the Guides. Indeed, despite amendments to one or both of these subsections in 2004 and 2009, the statutory statement that impairment ratings are to be "based on" the revised third edition remains unchanged. Because the legislature is presumed to be aware of judicial statutory interpretations, "where, as here, there is no express intent to repeal or abrogate existing law

13

. . . we presume that the legislature 'accepted and ratified [our] prior judicial construction' of the statute." *Sullivan v. People*, 2020 CO 58, ¶ 17 (quoting *People v. Swain*, 959 P.2d 426, 430-31 (Colo. 1998)).

¶ 28    To summarize, the Desk Aid states that the determination of whether normalization is necessary rests squarely with the examining doctor, who "may" follow normalization procedures "when deemed appropriate." In our view, the Desk Aid does not reject the revised third edition of the Guides; rather, it expands on the factors upon which doctors may, in their discretion, base impairment ratings. And, as we have pointed out above, the legislature gave doctors that discretion by using the phrase "based on" in subsections 101(3)(a)(I) and 101(3.7). Given the legislature's acceptance of this medical discretion, and its long-term acceptance of *Wackenhut* and *McLane*, we conclude that the panel's interpretation of subsections 101(3)(a)(I) and 101(3.7) is consistent with the legislature's intent. We therefore will not set it aside. *See Zerba v. Dillon Cos.*, 2012 COA 78, ¶ 37 ("The [p]anel's interpretation [of the Workers' Compensation Act] will . . . be set aside only 'if it is inconsistent with the clear language of the statute

or with the legislative intent.'" (quoting *Support, Inc. v. Indus. Claim Appeals Off.*, 968 P.2d 174, 175 (Colo. App. 1998))).

¶ 29    Claimant's two remaining contentions do not persuade us to reach a different conclusion.

¶ 30    Initially, claimant asserts, without citing any legal authority, that, by recommending normalization, "the Desk Aid specifically discriminates against individuals based on age and body habitus [physical build]," ostensibly because older workers are more prone to arthritis and cannot "remember every injury that they have suffer[ed] to the nonindustrial injured limb."  But he does not articulate how the panel's interpretation of subsections 101(3)(a)(I) and 101(3.7) discriminates against him and other similarly situated workers.  And he does not offer any examples illustrating how the physician, the Division, the judge, or the panel treated him differently or how his individual circumstances produced an unequal application of subsections 101(3)(a)(I) and 101(3.7).  We decline to address this contention because he has not developed it. *See Sanchez v. Indus. Claim Appeals Off.*, 2017 COA 71, ¶ 41 (declining to address "underdeveloped arguments" (quoting *Antolovich v. Brown Grp. Retail, Inc.,* 183 P.3d 582, 604 (Colo. App.

15

2007))); *Meza v. Indus. Claim Appeals Off.*, 2013 COA 71, ¶ 38 (same).

¶ 31    Finally, claimant theorizes that the physician wrongly thought that he was required to follow the normalization procedure described in the Desk Aid even though its use is discretionary.  But he does not develop this assertion either.  Rather, he simply raises it, without offering legal authority or citations to the record to support it.  We therefore will not address it.  *See Mauldin v. Lowery*, 127 Colo. 234, 236, 255 P.2d 976, 977 (1953)("It is the task of counsel to inform us, as required by our rules, both as to the specific errors relied on and the grounds and supporting facts and authorities therefor."); *see also Sanchez*, ¶ 62 ("'Given the dearth of legal grounds offered,' we decline to address claimant's remaining arguments." (quoting *Meza*, ¶ 38)).

¶ 32    The order is affirmed.

JUDGE ROTHENBERG and JUDGE TAUBMAN concur.